**Vladimir BERKOVICH,**
**Plaintiff–Appellant,**

v.

**Winslow HICKS; Stephen G. Tate, individually and as New York City Police Officers; City of New York, a Municipal Corporation, Defendants–Appellees.**

No. 133, Docket 90–7257.

United States Court of Appeals,
Second Circuit.

Argued Sept. 17, 1990.

Decided Jan. 4, 1991.

Robert L. Herbst, New York City, for plaintiff-appellant.

Margaret G. King, Asst. Corp. Counsel, City of New York, New York City (Victor A. Kovner, Corp. Counsel of the City of New York, Stephen J. McGrath, Asst. Corp. Counsel, City of New York, New York City, of counsel), for defendants-appellees.

Before OAKES, Chief Judge, MESKILL, Circuit Judge, and RESTANI,* Judge.

MESKILL, Circuit Judge:

Vladimir Berkovich appeals from a judgment of the United States District Court for the Eastern District of New York, Tsoucalas, J., entered after a jury trial, rejecting Berkovich's section 1983 and pendent state law claims in their entirety. The questions presented on appeal are whether the district court committed reversible error in denying a discovery request, in excluding certain evidence at trial, in failing to give Berkovich a fair trial, and in denying his motion to set aside the jury verdict.

We affirm.

## BACKGROUND

The jury heard the following evidence. Early in the morning of March 22, 1985, two New York City police officers, defendants Winslow Hicks and Stephen G. Tate, were patrolling a section of Brooklyn, New York near Lincoln Terrace Park. At 3:15 a.m., the officers observed Vladimir Berkovich sitting in a parked car on Buffalo Avenue. The interior light in the car was lit and the officers noticed that Berkovich was holding something near his face. As they drove up to Berkovich's car, they saw Berkovich holding a clear cellophane bag containing a white powder. The officers left the police car and approached Berkovich. They asked him for identification and seized the powder. According to Berkovich, Hicks tasted the powder, a fact that Hicks and Tate both denied. Berkovich reluctantly got out of the car, threatening, he testified, to complain about the stop. Tate then frisked him, placed him under arrest for possession of an illegal substance, and handcuffed him.

Hicks drove Berkovich to the stationhouse, while Tate followed in Berkovich's car. During the drive to the precinct, Berkovich testified, he warned Hicks that he would complain about the arrest. Hicks did not respond until he parked the squad car in the precinct parking lot. At that point, according to Berkovich, Hicks turned around and placed his gun to Berkovich's face, saying, "Shut up or I'll blow your head off." Berkovich also stated that Hicks offered to release him at this point but that Berkovich asked to be taken into the precinct instead, fearing that Hicks might shoot him.

At the precinct stationhouse Hicks told the desk officer that Berkovich had been arrested for possession of cocaine. Berkovich then asserted for the first time that the cellophane bag contained Nutrasweet and that, at the time of the arrest, he was merely putting Nutrasweet in his coffee. He did not, however, mention the alleged threats made by Hicks outside of the police station. Still handcuffed, Berkovich was placed alone in a detention cell. Upon sitting on a bench in the cell, Berkovich caused a juice bottle to fall and break on the cell floor. Tate and, according to Berkovich, Hicks came into the detention cell to sweep up the glass.

While Berkovich was in custody at the police station, first Tate and later Hicks

* Honorable Jane A. Restani, *Judge,* United States Court of International Trade, sitting by designation.

escorted him to the bathroom. During his second trip to the bathroom, Berkovich testified, Hicks taunted him, made lewd gestures at him, and cut him several times on the right front of his abdomen, his lower back and sacrum. Berkovich claimed that Hicks used a piece of the glass that had earlier broken in his cell. After this incident, Hicks handcuffed Berkovich again and returned him to the cell. Berkovich did not inform anyone at the stationhouse what Hicks allegedly had done to him.

Shortly thereafter, Hicks and Tate drove Berkovich to Central Booking. Berkovich testified that, as soon as Hicks and Tate left him in the holding pen there, he reported to the desk sergeant that he had been cut and asked to see a doctor. Paramedics subsequently cleaned and bandaged his lacerations. Berkovich also stated that, later in the day, he was involved in a fight in the holding pen at Central Booking. Berkovich was released in the afternoon on March 24, 1985, after being in custody for more than sixty hours. On April 3, 1985, the district attorney dismissed the charges against Berkovich, because the laboratory report showed that the powder seized from Berkovich did not contain a controlled substance.

In March 1986, approximately one year after his arrest and release, Berkovich brought federal and pendent New York state law claims against Hicks, Tate and the City of New York. He charged Hicks and Tate with false arrest and unlawful imprisonment, charged Hicks with making a verbal threat and with assault and battery, and charged the City of New York with failure to train, supervise and discipline Hicks under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The claims were based on 42 U.S.C. §§ 1983 and 1985, the United States Constitution, and New York state law.

The case first went to trial before Judge Costantino on November 13, 1989. On November 16, however, during cross-examination of Berkovich's expert pathologist, Dr. Laurence Alper, defense counsel elicited evidence that Dr. Alper's files contained a report of the Liman Commission. The Li-

man Commission report included an investigation of, among other things, the alleged responsibility of defendant Hicks in a shooting death. As a result, Judge Costantino granted defendants' motion for a mistrial on November 20, 1989. The retrial was scheduled before Judge Tsoucalas. After an eight day trial in December 1989, the jury returned a unanimous verdict for the three defendants on all claims. The district court orally denied Berkovich's motion to set aside the jury's verdict. This appeal followed.

## DISCUSSION

Berkovich claims that the district court made several reversible errors during the trial. He contends that the district court erred (1) in denying his discovery requests to obtain access to complaints initiated against Hicks and in excluding any evidence of these complaints during the trial, (2) in excluding other relevant evidence, and (3) in failing to give him a fair trial as a result of questions asked by the judge during the trial. Berkovich seeks reversal of the district court's decision denying his motion for judgment n.o.v. and, in the alternative, for a new trial. We address Berkovich's claims seriatim.

### A. *Civilian Complaints Filed Against Hicks*

During discovery Berkovich twice sought access to Civilian Complaint Review Board (CCRB) files concerning seven prior complaints lodged against Hicks. He also sought to question Hicks during his deposition about his recollections of these complaints. Judge Costantino and, later, Judge Tsoucalas denied these discovery requests after reviewing *in camera* the complaints filed against Hicks. Berkovich also tried to introduce evidence at trial that Hicks had a history of civilian complaints being filed against him. Judge Tsoucalas excluded all evidence relating to the prior complaints under Fed.R.Evid. 403 and 404(b).

### 1. Denial of Discovery of Complaints

■ Assuming without deciding that the district court erred in denying full discovery of the seven complaints, we find any error to be harmless for several reasons. First, as the district court observed, Hicks was exonerated on all of the charges in the prior complaints, except one involving abusive language. This lessens significantly the probative value of these complaints. It also raises doubt whether Berkovich would have been able to prove that the incidents complained of actually occurred. "[S]imilar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Huddleston v. United States*, 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988).

Second, Berkovich knew the details of the most egregious complaint, the shooting, and knew the general allegations involved in the other complaints, which ranged from abusive language and assault to striking one victim in the back and handcuffing another too tightly. Berkovich claims prejudice, however, because he desired access to the names of the victims and witnesses in order to conduct his own investigation of the incidents. Although his investigation might have established that the incidents occurred and might have shown that they were relevant to the case at bar, this tenuous string of possibilities is insufficient to warrant a new trial.

Finally, it seems improbable that full discovery of the seven complaints would have led to admissible evidence. As we discuss below, the district court properly excluded any reference to the complaints during the trial under Rule 403 and Rule 404(b). Nothing that has been brought to our attention, including our own review of the CCRB files, suggests that full discovery of the complaints would have resulted in a different trial decision.

### 2. Exclusion of Evidence of Prior Complaint History

Berkovich argues that the district court abused its discretion by excluding at trial all references to Hicks' history of prior civilian complaints. Under Rule 404(b), wrongful acts evidence may not be admitted merely to show the defendant's propensity to commit the act in question. But such evidence may be admitted for any other relevant purpose under our "inclusionary" approach. *United States v. Brennan*, 798 F.2d 581, 589 (2d Cir.1986). The potentially broad reach of this "inclusionary" approach, however, is limited by Rule 403. It permits the exclusion of relevant evidence if the probative value of that evidence is "substantially outweighed" by, among other things, "the danger of unfair prejudice." Fed.R.Evid. 403. A trial court has "broad discretion" in decisions relating to extrinsic acts. *Ismail v. Cohen*, 899 F.2d 183, 188 (2d Cir.1990). Such decisions will only be reversed for abuse of discretion. *Id.*

■ Berkovich first contends that the prior complaints showed Hicks' "sadistic," "malicious," "aggravated state of mind." This proffer amounts to no more than a veiled attempt to do what Rule 404(b) expressly prohibits—introducing evidence of bad acts to show the defendant's propensity to commit such acts. In addition, contrary to Berkovich's contention, it seems unlikely that this type of propensity evidence could have been introduced to establish the *Monell* claim. In a combined trial, such evidence could not have been admitted without compromising the rights of Hicks. Having reviewed the prior complaints ourselves, we find little in them to support a *Monell* claim—certainly not enough to amount to reversible error.

■ Berkovich next argues that the prior complaints should have been admitted to establish a pattern of conduct by Hicks. To merit admission under this theory, the extrinsic acts must share "unusual characteristics" with the act charged or represent a "unique scheme." *United States v. Benedetto*, 571 F.2d 1246, 1249 (2d Cir.1978). Assuming that the allegations of the seven prior complaints could be proved, they do not show the kind of *modus operandi* claimed in this case. Berkovich buttresses his argument by relying on *Ismail v. Cohen*, a section 1983 action in which we

affirmed the district court's admission of a subsequent complaint issued against the defendant police officer. In *Ismail*, however, the complaint arose under nearly identical circumstances to the incident for which the defendant was then on trial. *Ismail*, 899 F.2d at 188. No such pattern connects the varied conduct alleged in the prior complaints to the allegations made by Berkovich.

■ Berkovich then argues that the prior complaints are relevant because they establish a motive for Hicks' conduct. Hicks arrested and attacked Berkovich, according to this theory, because he wanted to discourage Berkovich from filing a complaint that would jeopardize further his record as a policeman, which was already blemished by seven civilian complaints. The evidence of prior complaints arguably may have had some probative value in establishing a motive for abusing an argumentative arrestee or for making a pretextual arrest. The district court observed, however, that introduction of the prior complaints would "inflame the situation." This remark suggests that the court balanced the relevance of this evidence against its potential for undue prejudice under Rule 403. The Supreme Court recently observed "that the strength of the evidence establishing the similar act is one of the factors the court may consider when conducting the Rule 403 balancing." *Huddleston*, 485 U.S. at 689 n. 6, 108 S.Ct. at 1501 n. 6. The earlier exoneration of Hicks on six of the seven prior complaints certainly lessens the probative value of Berkovich's similar act evidence, tilting the scales further toward a finding of undue prejudice. The trial court therefore did not abuse its discretion in finding that the slight probative value of this evidence—as to a theory of motive, pattern or other less plausible theories of relevance—was substantially outweighed by its potential for unfair prejudice.

B. *Other Evidentiary Rulings*

Berkovich challenges a number of the district court's other evidentiary rulings. These objections are also examined under the abuse of discretion standard of review. *United States v. Aulet*, 618 F.2d 182, 191 (2d Cir.1980).

1. *Nature of the Powder*

Soon after discovery began in the fall of 1986, defendants located the powder that had been seized from Berkovich in the office of the police department's property clerk. Defendants communicated to Berkovich their understanding that the powder would be preserved unless a request was made that it be destroyed. One year later, on August 6, 1987, Berkovich sent a letter to defendants requesting, among other things, that a mutually convenient date for an examination of the substance be arranged. This meeting apparently never took place because early in 1989 Berkovich renewed his request that a meeting be arranged to see the powder. Upon making this request, defendants informed Berkovich that the powder had been destroyed inadvertently.

During the trial Berkovich attempted to offer evidence of the disappearance of the powder and to obtain an instruction allowing the jury to draw an adverse inference from the powder's disappearance. Berkovich also sought to preclude the defendants from arguing that the powder was a so called "beat" drug, a non-drug substance that resembles drugs sold to an unsuspecting drug buyer. The district court denied all three requests.

■ Evidence of the powder's disappearance was properly excluded in light of defendants' stipulation that the powder was not a controlled substance. The powder was preserved long after the police laboratory determined that the powder was not a controlled substance and the criminal case was abandoned. Given the stipulation and the lack of any evidence of bad faith on the part of the city's property clerk, the city's negligent destruction of the powder specimen had little, if any, probative value on the question whether Hicks and Tate had probable cause to arrest Berkovich. Therefore, it was not an abuse of discretion for the district court to exclude evidence of the powder's disappearance.

■ Absent any evidence of bad faith, Berkovich also was not entitled to an instruction allowing the jury to draw an adverse inference from the destruction of the powder. Berkovich wanted the jury to be instructed that it could infer from the destruction of the powder that the powder was in fact Nutrasweet. This instruction, Berkovich argues, would have bolstered his theory that Hicks, having tasted the powder, knew it was Nutrasweet and, as a result, lacked probable cause for the arrest. While the jury might have disbelieved both Hicks' and Tate's testimony that Hicks did not taste the powder, there was no evidence that Hicks could identify the powder if indeed he had tasted it. On the facts of this case, "one cannot justify the drawing of ... an [adverse] inference where the destruction of evidence is unintentional." *INA Aviation Corp. v. United States*, 468 F.Supp. 695, 700 (E.D.N.Y.), *aff'd*, 610 F.2d 806 (2d Cir.1979).

Finally, the district court correctly allowed both parties to argue before the jury their theories about the nature of the powder—Berkovich maintaining it was Nutrasweet and the defendants claiming it was a "beat" drug. The district court's rulings on these questions did not prevent the plaintiff from fairly presenting his case to the jury.

### 2. *Hicks' Logbook*

■ Berkovich contends that the district court committed reversible error by preventing the use of deposition testimony indicating that Hicks threw his logbook away and by refusing to allow Berkovich to draw an adverse inference from this act. Berkovich sought to establish from this evidence a cause and effect relationship between Hicks' becoming a defendant in the case and his discarding his logbook. The court denied the request because Berkovich was dilatory in subpoenaing the logbook; the relevant deposition testimony prejudicially referred to Hicks' termination from the police force; and Hicks' testimony suggested that he threw his logbook away after he was terminated, not when he was named a defendant in the case. The district court did not abuse its discretion in making this evidentiary ruling. Evidence of the destruction of the logbook would have had only a speculative bearing on the merits of Berkovich's case. The act was not relevant to any fact actually in dispute. Moreover, what little evidence there was concerning Hicks' motive in discarding the logbook indeed suggested that he threw it away because he was clearing out his locker after he was terminated as a police officer, not because he was named a defendant in this case. The court could therefore have properly excluded the evidence under Rule 403, because the evidence possessed slight probative value relative to its tendency to confuse the issues, mislead the jury, or unfairly prejudice defendant Hicks.

### 3. *Expert Testimony Concerning the Nature of Cocaine and Nutrasweet*

■ Berkovich argues that the district court erred when it excluded rebuttal testimony by his expert concerning the contrasting tastes and physical appearances of cocaine and Nutrasweet. This argument also relates to Berkovich's theory that the officers knew that the powder seized from Berkovich was a harmless sugar substitute but arrested him anyway. The court correctly found this to be improper rebuttal, because the officers were not required to be, nor did they claim to be, experts at identifying cocaine. In addition, such testimony could have unfairly prejudiced the defendants by creating the misleading inference that police officers are required to differentiate white powdery substances with the skill of an expert.

### 4. *Evidence Concerning the Scene of the Arrest*

■ First, Berkovich contends that the district court erred by refusing to allow evidence concerning the street signs at the scene of the arrest. Berkovich sought to introduce this testimony through his private investigator to rebut testimony presented by the defendants' witness, Kathie Keegan, an official of the Borough Engineer's office. Keegan had testified that street signs on Buffalo Avenue in 1985, as well as in 1989, prohibited standing between the hours of 8:00 p.m. and 8:00 a.m. This testimony served to raise doubts about Berkovich's claim that he parked on

Buffalo Avenue after seeing a sign allowing parking at 3:00 a.m.

To discredit Keegan's testimony, Berkovich offered 1989 photographs of street signs at the scene of the incident. These photographs, however, were not probative of the location of street signs four and one-half years earlier at the time of the incident. To the extent they contradicted Keegan's testimony about the 1989 status of the signs, the photographs also could properly be excluded under Rule 403 as extrinsic evidence concerning collateral matters. *See* Fed.R.Evid. 403; *McCormick on Evidence* § 47, at 110 n. 6 (3d ed.1984).

■ Second, Berkovich tried to introduce testimony concerning the probability that "no standing" signs were in the area of the arrest. Because Berkovich's witness was not an expert in statistics relating to the number of different types of parking signs in the area, the court properly excluded this testimony as improper rebuttal.

■ Finally, Berkovich attempted to rebut testimony concerning the length of police squad cars. Defendant Tate had testified that police squad cars were twelve feet long, a fact relevant to his testimony that he and Hicks first saw Berkovich when they were four to five squad car lengths away from his car. Berkovich sought to impeach this testimony, as well as the officers' ability to see what Berkovich was holding, with evidence that squad cars are at least sixteen feet long. This evidence was also properly excluded because Tate's testimony concerning the number of squad car lengths between the patrol car and Berkovich's car was merely an estimate. The district court did not abuse its discretion under Rule 403 in excluding this rebuttal evidence as well.

#### 5. *FBI Report*

■ Berkovich claims that the district court committed reversible error by excluding an FBI report containing a summary of an interview with Tate. The summary included an account of Hicks' whereabouts during the alleged assault and battery against Berkovich, a subject on which conflicting evidence was introduced at trial. Berkovich intended to refresh Tate's recollection with the summary and then, if necessary, to impeach Tate's trial testimony concerning the location of Hicks during the processing of the paperwork for the arrest and the alleged cutting of Berkovich. The court properly refused to allow Berkovich to use this testimony. A "trial judge has broad discretion to organize or limit the use of evidence to refresh recollection." *20th Century Wear, Inc. v. Sanmark–Stardust, Inc.*, 747 F.2d 81, 93 n. 17 (2d Cir. 1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985). *See also United States v. Baratta*, 397 F.2d 215, 221–22 (2d Cir.), *cert. denied*, 393 U.S. 939, 89 S.Ct. 293, 21 L.Ed.2d 276 (1968). The summary was not the recollection of Tate, but was the recollection of an FBI agent. The summary also contained ambiguities concerning the location of Hicks and Tate during the time of Berkovich's detention. These factors provided a sufficient justification for the court's ruling.

#### C. *Questions by the Trial Judge*

■ Berkovich claims that several pointed questions by the trial judge deprived him of a fair trial, because they suggested to the jury that the judge doubted Berkovich's credibility. A trial judge may ask questions of a witness to clarify for the jury earlier testimony by the witness. Fed.R.Evid. 614(b); *United States v. Victoria*, 837 F.2d 50, 54 (2d Cir.1988). Questions that clarify ambiguities, correct misstatements, or obtain information necessary to make rulings fulfill this necessary judicial function. *Victoria*, 837 F.2d at 54. The judge's questions may not, however, convey the court's view about the merits of a party's claim. *Id.*

Berkovich challenges six colloquies that occurred over the course of the eight day trial. Placed in their proper context, these exchanges either involved appropriate efforts to clarify answers to questions or had little bearing on significant issues in the case. Therefore, they were unlikely to have altered the jury's evaluation of the merits of Berkovich's claim. It also bears noting that the court asked the defendants equally challenging questions. On one occasion, for instance, the court elicited an admission from defendant Hicks that he

was dismissed from the police force for substance abuse.

### D. *Motion to Set Aside the Verdict*

 Berkovich contends that the district court erred when it denied his motions for judgment n.o.v. and for a new trial, particularly in relation to the federal and state law battery claims against defendant Hicks. Judgment n.o.v. should be granted only when

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [people] could not arrive at a verdict against him.

*Bauer v. Raymark Industries, Inc.,* 849 F.2d 790, 792 (2d Cir.1988) (quoting *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 688–89 (2d Cir.1983)). Berkovich does not meet this rigorous standard.

Focusing on the federal and state law battery claims against Hicks, Berkovich argues, in effect, that the following evidence requires us to set aside the verdict: Berkovich was rear-handcuffed during the entire time he was in detention except when he was taken to the bathroom; a bottle broke in Berkovich's cell; and Berkovich was treated for lacerations while in detention. Although this evidence might suggest that Hicks cut Berkovich with broken glass, that is only one possible conclusion the jury might reach. As the district court observed when it denied Berkovich's motion to set aside the verdict, Berkovich never eliminated the possibility that he had these cuts before the arrest. Moreover, Hicks and Tate both denied any knowledge about how Berkovich was cut. In spite of Berkovich's testimony to the contrary, the jury may also have believed that Berkovich received these injuries when he was involved in fights while detained in Central Booking. Berkovich's argument that judgment n.o.v. should be given on his other claims is also meritless and does not warrant further discussion.

Berkovich alternatively argues that the district court should have granted his mo-

tion for a new trial, because the verdict was against the weight of the evidence. On appeal, however, when a new trial is sought on the ground that the jury verdict was against the weight of the evidence, "we have disclaimed the authority to review a ruling on such a motion." *Newmont Mines, Ltd. v. Hanover Ins. Co.,* 784 F.2d 127, 133 (2d Cir.1986) (citations omitted). Accordingly, the district court's decision on this motion must stand.

### CONCLUSION

For the above reasons, we hold that the district court did not commit reversible error in its discovery and evidentiary rulings, that the court's questions did not deprive Berkovich of a fair trial, and that the district court's decision not to grant judgment n.o.v. or a new trial was not erroneous. We affirm the judgment of the district court.

OAKES, Chief Judge (concurring):

I concur in the result.